|  |  |  |
|---|---|---|
| | * | |
| **MARKKU TORYALAI HART,** | * | |
| Petitioner, | * | **Case No.: GJH-19-2601** |
| | * | |
| v. | * | |
| | * | |
| **SALLY BELCO ANDERSON,** | * | |
| Respondent. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, 1980 WL 115586 (the "Hague Convention" or "Convention"). Pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C §§ 9001–9011, which implements the Hague Convention in the United States, petitioner Markku Toryalai Hart ("Hart" or "Petitioner") filed a Petition before this Court on September 9, 2019 to seek return of his children to France after his wife, respondent Sally Belco Anderson ("Anderson" or "Respondent") brought them to the United States without Hart's consent. The Court held a two-day evidentiary hearing on November 6 and 7, 2019 and an additional hearing for legal argument on November 13, 2019. After carefully considering the evidence presented at the hearings and the parties' arguments, the Court will grant the Petition.

## I. FACTUAL BACKGROUND

Mindful that "[n]either ICARA nor the Hague Convention specifically dictate how courts are to proceed when considering a petition under the [Convention]," *Menechem v. Frydman-Menachem*, 240 F. Supp. 2d 437, 443 (D. Md. 2003) (citing *Zajaczkowski v. Zajaczkowska*, 932

1

F. Supp. 128, 130 (D. Md. 1996)), the Court makes the following findings of fact based on the evidence presented at the hearings, which included the testimony of the parties, their respective mothers, and a family friend, as well as documentary materials.

Hart, a dual citizen of the United States and United Kingdom, and Anderson, a U.S. citizen, first met in the spring of 2010 in Bamako, the capital of the African nation of Mali, at a dinner hosted by Anderson's father. They commenced a relationship that summer and began cohabitating in August of that year. Both parties had significant connections to Mali: Hart had spent substantial portions of his childhood there and had maintained friends and relationships into adulthood, while Anderson's father was living in Mali at the time the parties met, and her mother was born and raised in the northern part of the country and has a large family there. Anderson has a Bachelor's degree in history and a Master's degree in teaching social studies and history, both from Virginia Commonwealth University, while Hart completed some university coursework but has not obtained a degree.

When the parties met, Anderson had just moved to Mali from Virginia and begun teaching preschool at the American International School of Bamako, a position she held until the fall of 2010 when she became the school's administrative assistant. Anderson describes herself as a teacher with particular interest in teaching at international schools. Hart is a self-employed consultant with expertise in cold chain equipment and logistics, which refers to the technology and procedures used to maintain the physical stability and medical effectiveness of vaccines when they are transported to impoverished and remote areas of the world. Hart has served as a contractor for international organizations including the World Health Organization, UNICEF, and PATH, which have typically retained him for contracts that have lasted less than one year in nations including the Maldives, Liberia, India, Cote D'Ivoire, Haiti, Uganda, Rwanda, Guyana, Gambia, and Mali. Pet'r's Ex. 12. Throughout the period relevant to this case, Hart used his

mother's address in Indiana as his business address and was paid in U.S. dollars through wire transfers to a U.S. bank account. Pet'r's Ex. 11. Hart also voted in Indiana in the 2016 presidential election, has paid taxes there, and maintains an Indiana driver's license.

In the summer of 2011, Hart took Anderson for the first time to a house owned by his mother in Usinens, France ("the Usinens House"), a village in the mountainous area in the southeast of the country approximately a half-hour drive from the Swiss city of Geneva. The house is located on a hill outside the center of the village on a road with other buildings surrounding it. Pet'r's Ex. 14. Hart's parents purchased the house in 1980. Though Hart lived in several different countries throughout his childhood and early life, he testified that the Usinens House in France has always been his "epicenter." He attended multiple years of school there as a child and stayed at the house on several occasions between moves to other countries before meeting Anderson. At present, Hart's mother holds the title to the house and pays for its utilities.

Architecturally, the Usinens House is composed of two cottages dating from the 17th century, which are connected by a stable and a barn. Hart's parents renovated the buildings during summers in the 1980s, focusing on the cottage closer to the road, to which they added running water and electricity. The main floor of that cottage contains a kitchen and living room separated by double glass doors and a small bathroom with a toilet and sink. In the living room is a fireplace, which is the primary heat source for the house. Upstairs from the main floor is a bedroom and small attic or cupola area, while downstairs is a washer and dryer, toilet, and shower. Separating the house from the road is a courtyard. The rear cottage has no running water but has a room large enough for guests to sleep in. Hart's mother testified that the renovations have remained unfinished and that ultimately she would like to connect the two cottages by incorporating the central stable and barn area as part of the house.

Hart and Anderson married in March 2012 and had their first child, A.M.A.H, the following month. Due to difficulty obtaining prenatal care in Mali, the parties decided that Anderson would travel to Indiana and stay with Hart's mother to have the child. Hart arrived there after Anderson, who stayed with Hart's mother from December 2011 through approximately April 2012. The family was unable to return to Mali immediately after A.M.A.H. was born because of a military coup, so Hart went to Mali alone, packed up the family's belongings, and drove to a friend's rental house in a beach village in Senegal, where Anderson arrived with A.M.A.H. a few days later. Eventually the political situation in Mali improved and the family returned to Bamako after approximately six months.

Hart, Anderson, and A.M.A.H. visited the Usinens House again in the summer of 2013. In August 2013, Hart began a contract with UNICEF that required him to reside in Mali for three years on consecutive 11-month contracts with breaks of one to two months in between. In the same period, Anderson became pregnant with the couple's second child, E.S.A.H., and proactively traveled to Virginia in January 2014 to stay with her parents to have the child, who was born in March 2014. Hart came to Virginia for two to three weeks around the birth, but returned to Mali soon after. Two months later, Anderson and the children returned to Mali and lived with Hart in new rental accommodations at a single-story villa with a garden and pool in a quiet neighborhood in Bamako. They also retained the services of a housekeeper, a cook, a nanny, and a gardener.

An incident between Hart and Anderson occurred at approximately this time in 2014, though the parties disagree on the details and exact timing. According to Hart, he had previously witnessed Anderson spanking A.M.A.H. and had strongly expressed his opposition to corporal punishment, but some days later, he heard Anderson spank the child again and confronted her. According to Hart, Anderson pushed him with significant force, and he pushed her forcefully in

response, which caused her to fall backwards, a result that he stated was accidental and frightening because she was pregnant. Anderson testified that the incident was after she had given birth to E.S.A.H. and that she was suffering from post partum depression, but conceded that she had spanked A.M.A.H., who she testified was two years old at the time.

In the summer of 2014, the parties and the children visited the Usinens House, and returned again for a visit in the summer of 2015. Hart's mother was also at the house for both visits. During this period, Anderson applied for employment in Mali as well as abroad, but was unsuccessful. The family also took other trips during this time, including once to visit family friends in La Ciotat, France, and once to Sri Lanka. At one point in the summer of 2015, Hart testified, Anderson took the children from France to the United States without his consent after purchasing round-trip tickets for a three-month trip, though she returned to France with the children within a few weeks and the family eventually returned to Mali.

In January 2016, following a terrorist attack at a hotel in Bamako and other security incidents, the parties evacuated the country and went with the children to the Usinens House while they evaluated if they should continue to reside in Mali. Hart and Anderson both testified to having had a shared understanding that they would remain in Mali despite ongoing conflict in other parts of the country but would leave if hostilities reached Bamako, as it had with the hotel attack. They returned to Mali at the end of January, but by the summer of 2016 they decided together that leaving was appropriate, both because of the security issues and because Hart's contract was expiring on August 31. Initially, they contemplated moving to the United States, but soon determined that they lacked adequate finances. They therefore decided to go to the Usinens House, where they could live rent-free and the children could attend the free local school, the Ecole Primaire de Challonges, which was approximately five minutes from the house by car or bus. The parties both testified that while they discussed the possibility of returning to Mali at

some point in the future if it stabilized politically, they had decided to leave and move to France, despite Hart being offered an extension on his existing contract shortly before they intended to leave. Anderson testified that she saw the move to France as a step until she or Hart secured employment that would take the family elsewhere. Hart stated that there was no anticipated time frame for the family to live in France.

In preparation for their departure from Bamako, the parties sold or gave away large items, including a kitchen table and chairs, a couch, and a coffee table, and sold their car. They also acquired a shipping crate to transport other belongings, including children's toys, books, bed frames and bedding, other furniture, office supplies and computers, rugs and wall hangings, African crafts and artwork, and sporting equipment used by Hart for kite surfing, mountain biking, and skateboarding. Having disposed of or packed their belongings and informed their friends that they were leaving, they flew to France and arrived at the Usinens House at the beginning of September 2016, where they unpacked toys, stuffed animals, books, a carpet, and Hart's sporting equipment. Hart also assembled a plastic playhouse for the children shortly after their arrival. Some of the family's belongings remained in storage, however, including the children's bed frames. Hart's mother was already at the Usinens House when they arrived, and had submitted paperwork so that A.M.A.H. could begin the school year at the Ecole Primaire de Challonges. Once the term had begun, Anderson visited the school to provide A.M.A.H.'s birth certificate and other documents.

The family remained at the Usinens House continuously through August 2018. Hart was able to live in France without a visa by virtue of his U.K. citizenship, and as the spouse of a U.K. citizen, Anderson was eligible and successfully applied for a *carte de sejour*, a French residence and work permit. In support of that application, Hart's mother prepared a handwritten note at Anderson's request attesting that Hart and Anderson were living at the Usinens House, which

Anderson submitted with other identification documents. *See* Pet'r's Ex. 2. The *carte de sejour* allowed Anderson to extend by one year the three-month period that certain European Union member states allow American citizens to remain without a visa. Anderson renewed the *carte de sejour* after a year passed. During this period, Hart abandoned his prior work in Mali and began new contract work for the World Health Organization in Geneva, serving for 10-day stints as a member of an expert technical review panel that would evaluate nations' proposals for funding for cold chain equipment before they would be submitted to a separate grantmaking organization. Hart was never employed by a French entity, nor did he obtain a French driver's license, open a bank account in France, or change his business address to the Usinens House.

Anderson continuously applied for positions in Geneva during this period but was unsuccessful, faced with the significant obstacle that potential employers would have had to sponsor her for a work visa, a very costly and lengthy process. Anderson also applied for positions in other countries, including in the United States, though Hart voiced strong opposition to her accepting a position that would require her to live apart from him and the children, that paid less than $50,000, or that would require moving to a city. Anderson felt that some of this opposition was unreasonable but never doubted that her husband had her best interests at heart. Though she remained unemployed, at the invitation of the Usinens village "matriarch," Anderson joined an informal village women's group that met Thursday mornings for breakfast and socializing. Anderson brought American food to the group and also began to assist with village festivals. Anderson did testify, however, that she was very unhappy during this period and was drinking alcohol regularly. In the fall of 2017, E.S.A.H. began attending school at the Ecole Primaire de Challonge, and A.M.A.H. returned for a second year. Both children spoke French at school. Documents introduced by Hart, including insurance policies and copies of schoolwork, reflect the children's enrollment. *See* Pet'r's Exs. 3, 6.

The children also made friends with children of similar age who lived across the street from the Usinens House, and testimony and documentary evidence indicate that they adjusted well to living in Usinens and to speaking French with their friends and at school. Hart testified that the children enjoyed the rural environment in Usinens as compared to Bamako, frequently visited with the children living nearby, and were involved in school activities including holiday festivities, dramatic and musical performances, and outdoor events. Anderson corroborated this account and noted that she also enrolled the children in music classes. Photographs that Hart introduced show the children learning to fish with him, gardening, walking on nearby hills, playing with friends in a play house, and using tablet computers with Hart's supervision. Pet'r's Ex. 1. Anderson stated that she was aware of these activities but also testified that between her and Hart, she was primarily providing care to the children. In particular, she explained that at one point in 2017 she left to visit an ailing relative and returned to find that the children's hair and teeth had not been adequately brushed and that they only were brought to school four out of the ten days that Anderson was absent.

The parties made improvements to the Usinens House during this period as well. Hart constructed a wall between the courtyard and the street and installed a stove and chimney for the rear cottage, the main floor of which he set up as an office and guest room after restoring some of the electrical wiring. The parties also treated and moved a wooden table from the living area to the courtyard and replaced it with a smaller table that was in storage. In the kitchen, Anderson installed a small spice rack and a shelf from Ikea to store pots and pans and to mount a microwave that her mother purchased. Hart's mother purchased a new oven, as well as a gate for the courtyard wall that Hart built, and a large umbrella and antique metal chairs for the courtyard. Hart and Anderson also purchased bookcases and drawers that the children decorated, installed a projector to display films, and moved other furniture around the house. The parties

also discussed future renovations between themselves and with Hart's mother. Potential plans included installing a bathroom in the rear cottage as well as a kitchen on its ground floor. The purpose of those renovations, Hart testified, is that the parties wanted more space so that the children could eventually have their own bedrooms.

In September 2017 and November 2017, Anderson's mother visited the family at the Usinens House. During one of these visits, she testified that she witnessed the younger child, E.S.A.H., suffer an arm burn one morning from walking too close to the woodstove in the living room of the house. Anderson put ice, lotion, and a bandage on the burn. At approximately 9:30pm that night, however, Hart returned and insisted that they take the child to the emergency room. Eventually Anderson agreed if Hart drove, but Anderson ultimately went alone without Hart, leaving between 10:00pm and 10:30pm to drive across the border to Switzerland. Heavy rain was falling at the time and Anderson's mother testified that there was snow and ice on the roads as well. When she asked Hart why he let Anderson drive by herself in that weather, he replied that it does not make a difference because he was the one that was paying.

In May 2018, Hart began work on a project with a team from multiple organizations to determine the cause of premature failures in cold chain equipment in Ghana, Malawi, and the Philippines, and traveled to an island in the Philippines to conduct testing. Hart had not previously been to the Philippines but found the island experience pleasant. When he returned to the Usinens House, he proposed to Anderson that they take the children there for an extended period. Both parties testified that there was a significant amount of tension in their marriage at that time and that Anderson, in particular, was unhappy in France. Though the children were fine there, Hart testified, he thought that it would be beneficial and therapeutic to spend time in the Philippines, particularly in that the family would be able to hire a maid to perform housework so that he and Anderson could avoid conflict over those responsibilities, would experience

increased sunshine to hopefully improve Anderson's depression, and would have access to kite-surfing, an activity Hart engages in that gives him an "adrenaline rush." Hart believed it was an opportune time for such an experience because the children were young, he worked from home, and Anderson did not have fixed employment. At most, however, he conceived of it as a one year trip, which hypothetically might become a longer stay; that understanding was consistent, he testified, with his impression that Anderson conditioned her approval of the trip on staying only one year.

Anderson testified that Hart was indeed "raving" about the Philippines when he returned from his trip there, specifically discussing its beautiful weather and beaches, friendly population, and that it reminded him somewhat of Mali. Anderson further testified that she had been vocal about her unhappiness in France and that she believed Hart was considering it as a factor in his suggestion that they go to the Philippines, though she felt that he was misunderstanding the reasons for her unhappiness.[1] Hart acknowledged his confusion, testifying that there were issues in the marriage that he did not know how to fix, which led him to propose a lifestyle change on a trial basis as a potential solution. The parties began researching potential places to go in the Philippines and settled on a resort island called Boracay, which they learned relatively little about besides that it was a kite surfing destination and that it had a European school, the Boracay European International School ("BEIS"), records from which would be accepted at French schools. In preparation for leaving France, Anderson contacted the consulate of the Philippines in Zurich, Switzerland to inquire about visas and bringing the family's cat, Timmy. She learned

_____

[1] Anderson had expressed this unhappiness privately in a diary entry in January 2018 that among other things included the statement "I cannot stand him" and the question "how do I get rid of him," which she testified referred to Hart. Pet'r's Ex. 13. Anderson further testified, however, that that was an internal and non-serious feeling that she had no intention of acting on, though she did express to Hart that there were issues in their marriage that they needed to find time to address.

that renewable tourist visas lasting one to two months would be issued at the airport when they arrived as long as they had purchased round-trip plane tickets.

Hart found that Turkish Airlines would be the best option to travel to the Philippines from France, while Anderson purchased the family's flight reservations, selecting return flights approximately 9.5 months after their departure, which she testified was the longest trip length the airline's reservation system would allow her to select. Anderson testified that they decided to leave France on August 19, 2018 – just three weeks after Hart had suggested that they go – so that they could arrive just before the school year began at BEIS and could return to France after it ended. Comments on Facebook by Anderson corroborate this planned timeline for returning. In one post, a friend named Crystel Duterque asked Anderson "Are you really leaving?" and "When are you leaving?" to which Anderson responded "We're leaving on Sunday. We plan to return to Usinens in 10 months". Pet'r's Ex. 9. In another, a friend named Melissa Halbach-Merz asked "How long will you be there?" Anderson replied "We are her [sic] for a year or so." *Id.* When asked what she meant by these statements, Anderson testified that she was referring to the families taking a summer vacation to France from the Philippines.

Importantly, the parties took few of their belongings to the Philippines. According to Hart, they brought with them some of his kite surfing equipment, his computer, and some changes of clothes, while the children each took one toy, their tablet computers, and basic clothing. The children left nearly all of their belongings at the Usinens House, photos of which Hart introduced, including shoes, scooters and tricycles, art supplies, a writing desk, school supplies, books, school bags and backpacks, and a nightlight device that makes noise in addition to projecting light. Pet'r's Ex. 1. Hart testified that these items were left because the family was planning to return to France and was not abandoning the Usinens House. Anderson did not dispute that the children left their belongings in France and that the family did not take to the

Philippines most of the items of importance that they had brought to France when they left Mali, though they did bring their cat.

In looking for accommodations during their three-week research period, the parties discovered that Boracay was closed to foreign visitors for six months because the federal government of the Philippines had ordered a cleanup of the area. For that reason, though the parties looked for an apartment, they were initially only able to secure an Airbnb rental. Anderson described the residence as a bamboo hut on a mountain with a thatched roof. Hart similarly testified that the dwelling was charming but impractical; the lack of internet access required him to use a cellular card to work and the humidity was too high for his computer to operate. Nonetheless, the family stayed there for between one and two months. They then moved to a small apartment closer to the beach which had air conditioning. That space was also inadequate, however, because it was a cramped upper floor of a house and it was close to a noisy beachfront area with bars and restaurants. During this period, the parties obtained temporary ID cards issued by the local government, *see* Resp't's Ex. 4, and the children began the school year at BEIS. Notably, the parties never obtained long-term visas or any residency permit analogous to the *carte de sejour* that Anderson had secured in France.

After two months in the beach apartment, Anderson located available living space in a complex called the Dutch Lion Apartments. With Hart's knowledge, she entered a "one-year" lease running from January 2019 to December 2019. Resp't's Ex. 5.[2] The lease was for two adjoining apartments, separated by a sliding glass door, which were air conditioned and furnished. The parties soon met Gina Kalimuddin and her husband Alvin, citizens of the

---

[2] The Court notes that written on this document near a printed section describing the lease term are the words "Rent Agree for 6 month to 1 year from Jan to Dec 2019." While Petitioner's counsel suggested during the evidentiary hearing that the lease might only be for six months, none of the witnesses testified to an understanding that the lease was for less than one year, nor did the parties make such a claim in their closing arguments. In fact, Hart testified that signing a one-year lease is the only way to obtain "a decent place" in the Philippines.

Philippines who provided assistance to the family at the Dutch Lion. Mr. Kalimuddin was a guide for tourists and drove a taxi that he used to drive the children to their school bus stop, while Mrs. Kalimuddin helped the children prepare for school in the mornings and performed light housework.

During this period, the parties continually renewed their short-term visas. *See* Pet'r's Ex. 8. Hart continued working on a contract with the organization PATH, which was renewed, while Anderson began tutoring some children at their homes. *See* Pet'r's Ex. 11. She also applied for employment at all of the resorts on Boracay, as well as in Manila and other cities, and continued submitting applications to positions in Europe and the United States, as she had previously done while living in Mali and at the Usinens House. Anderson testified that she also joined the PTA at BEIS, enrolled the children in ballet classes, attended yoga classes herself, and made friends.

At the end of January 2019, an incident occurred on which the parties' testimony differs. Hart and Anderson agree that they had gone to a party at the home of a friend and that Anderson left early to take the children home to bed while Hart stayed behind, returning to the parties' apartment a few hours later. Anderson testified that she was lying in bed between the children in the children's bedroom when Hart arrived and asked her to sleep with him, which she declined, saying that he should go to sleep. Hart responded by saying that he was frustrated to be rejected when Anderson typically complains that Hart shows a lack of sexual interest in her, to which Anderson replied that Hart was drunk and should go to bed and that they would talk the following day.

Anderson testified that Hart then left the room briefly but returned carrying his iPad, which was playing pornography loudly, and had removed his clothes and begun masturbating. Anderson screamed and asked Hart to go away and said that they would talk the next day. Hart left again, but then returned, told her that he had forgotten that "you like it rough," grabbed her

by her leg and forearm, dragged her out of bed and out the door, and threw her against a wall. When she turned around to push him away, he slapped her in the face, after which she screamed again and reached over to close the door to the children's bedroom, where she saw the children stirring, although they had not woken up. Anderson continued to tell Hart to calm down, but he remained angry and eventually threw a plastic water kettle used for making coffee and a half-full beer bottle at her, the sounds of which woke up the children, who asked what was happening.

Anderson then took the children to the living room and turned on the television, and called Hart's mother to tell her that Hart was drunk and out of control. While Anderson was on the phone, Hart went to where the family's passports were stored, took Anderson's and the children's, and hid them. Hart then took the phone, made insulting and demeaning statements about Anderson, and said that he wished she would leave. Anderson responded that there was nowhere she could go without her passport, after which Hart retrieved her passport and threw it at her, hitting her in the face, and hung up the call with his mother. In his testimony, Hart acknowledged the incident but stated that when he arrived home, Anderson was also inebriated and angry and threatened to take the children and leave. At one point, Hart testified, something hit him in the face, leading him to angrily throw the plastic kettle in the direction of the glass door separating the two apartments. He denied striking Anderson or throwing any objects at her.

The Court found Anderson's overall testimony about this incident to be more credible than Hart's and tends to believe the facts as Anderson recited them but with some caveats. Anderson's testimony is corroborated by photographs that she took after the incident. *See* Resp't Ex. 14. One photograph shows her right calf with light finger-shaped bruising, while another shows her forearm, which also has light bruises that may be finger-shaped. *See id.* Anderson's testimony about the contents of these pictures was unrebutted, and the Court finds that they support her account that Hart pulled her out of bed by her arm and leg. However, it is difficult to

reconcile the force Anderson claimed was used to "drag" her out of the bed with her testimony that the children were in the bed with her, yet slept through that portion of the incident. On cross examination, Hart's mother confirmed that Anderson called her on the night of this incident and told her that Hart had taken the children's passports, though she did not recall Anderson saying that Hart had jumped on her and bruised her. Hart's mother also confirmed that Anderson had spoken with her on other occasions about Anderson's concerns about Hart and their relationship.

Hart's mother also separately testified that later in the spring of 2019, a family friend, Daphne Patai, was planning to give to her and Hart a substantial amount of money as a gift to be used to renovate the Usinens House. An email exchange from May 1, 2019 introduced by Hart shows his mother and Patai discussing the details and purpose of the gift. Pet'r's Ex. 4. Hart testified that he learned about the gift from his mother at this time and told Anderson, and that they were both excited about renovating and expanding the Usinens House.

At approximately the same time, Anderson was approached by a member of the BEIS staff about substituting for a math teacher at the school from August to December 2019 while the teacher was on maternity leave. Anderson accepted the position and signed an undated memorandum of understanding with the school. Resp't's Ex. 10. Though Hart testified that it had become apparent within a few months of arriving on Boracay that it was not a permanent place to stay, both parties testified that they were excited about Anderson's position and felt it was an excellent opportunity for her to obtain experience teaching in an international school, which would help her obtain similar jobs in the future. Additionally, the position entitled the family to a fifty percent tuition discount at BEIS. In May 2019, Anderson completed a form stating that the children would be enrolling at the school for the 2019-2020 school year and that their tuition would be paid at the beginning of each trimester on August 27, 2019, December 2, 2019, and April 2, 2020. Resp't's Ex. 36. Anderson further testified that she hoped the temporary position

would improve her chances of working at the school full-time when it replaced teachers who would leave in 2020 pursuant to the typical two-year rotation practices of international teachers.

While the parties were still in the Philippines at the end of June 2019, another incident involving alcohol took place at the Dutch Lion. Anderson testified that she attended an end of year program for the children at BEIS and then took them to a restaurant on the beach where friends gathered to say goodbye before the parties left for France. Hart attended at Anderson's request. The children grew tired as the evening progressed and friends offered to take the children to their condominium next door with their own children to watch television on their couch. Anderson allowed them to go and stayed with the adults and Hart for another hour. According to Anderson, Hart then said that he and another friend wanted to go to a different bar, which she at first opposed before relenting. Hart gave Anderson his bag with his house keys and tablet computer, and Anderson said that she would wait for him at their friends' condominium after he said he would be gone only an hour.

Anderson testified that she waited at the condominium but that Hart never returned, and that she fell asleep with the children on the couch and woke up at 6:00am and returned home. Meanwhile, Hart asserts that when he returned from the second bar, he looked for Anderson but was unable to find her. Additionally, the vehicle he was riding in hit an exposed pipe at a road construction site and Hart was thrown onto the road, broke a tooth, and sustained other minor injuries. He eventually made his way back to the Dutch Lion, where he tried unsuccessfully to call Anderson because he was unable to enter the apartment without his keys. He also tried to contact the landlord. Unable to enter, Hart testified that he was able to push the door in with his shoulder so that he could enter.

When Anderson arrived at approximately 6:30am, she thought someone had broken into the apartment because three of the wooden panels of which the door was constructed were

missing. *See* Resp't's Ex. 14. She began screaming Hart's name because she thought someone had broken into the apartment, but found Hart sleeping in bed and woke him to ask what had happened. Hart told her that he had to break into the apartment because he did not have his keys. She replied that Hart was supposed to come back to get her at the restaurant but that he never returned, and he told her not to worry because it was just a door and they would pay the landlord to replace it. Anderson testified that she felt crushed and overwhelmed because the family had previously had to ask landlords to wait for rent and utility payments but now had to also apologize for destruction of property. Anderson located the three missing panels and was able to slide one back into place but used tape to remount the other two. Anderson further testified that there were footprints on the door frame, leading her to believe that Hart had kicked the door in.

The following day, June 30, 2019, Anderson exchanged text messages with her father. Pet'r's Ex. 19. She stated that "I'm so exhausted from this whole relationship. I ce [sic] tried to 'love' him they it [sic] but it's only escalated[.] He has become unreliable, unpredictable and abusive[.] I told carol [sic] and told her that she needs to get him I [sic] to treatment[.] That's why she is coming to France." Her father responded that "It sounds untenable and unhealthy for everyone," and Anderson replied "It's not healthy and that's not fair to the kids[.]" Her father then asked "Does this mean you will not go back to the Philippines?" Anderson replied that "I accepted the position at the school and want to follow thru [sic]. That will be done in December and I can move back to the US then." When questioned about these messages, Hart testified that he had had no discussions with Anderson about the family moving to the United States and was strictly opposed to that plan. More broadly, he testified that there had been no discussions between him and Anderson about ending or dissolving their marriage. On cross examination, Anderson testified that she did not actually believe she was going to the United States after her position ended in the Philippines.

17

Two days later, July 2, 2019, the family departed Boracay for France. They had removed all of their belongings from one of the two adjoining apartments at the Dutch Lion and placed them in boxes in the other apartment. Items left in the boxes included computer monitors and kite surfing equipment Hart had bought in the Philippines, the kite surfing equipment he had brought from France, a Playstation console, and some equipment related to his consulting projects. The cat had also run off and was left behind, though Hart hoped that the Kalimuddins would find it and take care of it. *See* Resp't's Ex. 33. Gina Kalimuddin testified that she had talked to the parties about finding the cat and feeding another cat named Ducky that the parties had acquired. On the day the family left Boracay, they left the keys to their apartment with Kalimuddin and asked her and her husband to look for a cheaper apartment for them to move into when they returned from France. Kalimuddin testified that after the family left, she went to the Dutch Lion each day to feed Ducky, and she and her husband looked for apartments.

On July 3, the family arrived at the Usinens House, where the children played with the toys they had left and later engaged in other activities including shopping, gathering wood for camp fires, and cooking outdoors. Anderson testified that the family's plan at this time was to have family and friends visit before returning to the Philippines in August, and Hart's mother testified that she had planned to visit but was unable because of a medical issue. Hart's mother had also exchanged emails the previous month with a family friend, Marie Zimmerman, stating her understanding that Hart, Anderson, and the children would arrive in Usinens on July 3 and would return to Boracay on August 10. Resp't's Ex. 11. Hart's mother confirmed in her testimony that, at that time, she expected Hart and Anderson to return to the Philippines after their limited stay in Usinens. Hart testified that his understanding was that the parties would then return to Usinens after Anderson's teaching role was complete and would start ordering materials for the renovations of the house using the money gifted to Hart's mother.

Some days after the family arrived at the Usinens House, a friend of Hart's named Irina Goreva came to visit and stay with the parties. Irina remained for Bastille Day, the French holiday celebrated on July 14 in which fireworks are lit, akin to the July 4 holiday in the United States. On the evening of July 14, the parties and Irina held a barbecue in their courtyard, where they and the children ate chicken, grilled vegetables, and salad, and the three adults shared and finished three bottles of wine between them. After the wine was exhausted, Hart began drinking pastis, a beverage with a sufficiently strong taste and high alcohol content that a small amount must be mixed with significantly more water in order to drink it. Hart testified that he might have consumed a few servings of pastis but was unsure. Later in the evening, Anderson left Hart in the courtyard and took the children and Irina to bring a bottle of wine to the Usinens "matriarch," who lived on the same street. Anderson testified that Hart arrived shortly after and was stumbling and weaving, but composed himself enough to speak to the matriarch and apologize for having had too much to drink.

After returning to the house, Anderson testified that as the time approached 9:30pm, she suggested that the family and Irina walk down the hill to an apple orchard with a view of a valley where fireworks would be set off. Because the sun does not set in Usinens in July until between 9:45pm and 10:00pm, and though the fireworks would not begin until after that, Anderson wanted to leave while it was still light because the path to the viewing location was not lit and it would be safer for the children. When she asked Hart if he was ready to go, he was sitting and hanging his head and slurred his words when he said that he was not ready because it was not dark yet. Irina had gone to the guest room in the rear cottage to retrieve something with the expectation that they would leave, and when she returned asked Anderson if Hart was coming. Anderson sent one of the children back to the courtyard to ask Hart again, but the child returned with the same answer from Hart, and so Anderson left with Irina and the children.

Approximately ten minutes later, Hart began sending text messages to Irina asking where the children were and saying that he could not find them, and did not understand when Irina explained where they had gone. Anderson then walked back up the hill to the house to retrieve Hart. From this point the parties' accounts diverge substantially. Neither party's testimony was completely credible, and both had been drinking that night, making a definitive account of the evening difficult to formulate. Anderson testified that when she reached the vicinity of the house, Hart was standing barefoot in the street outside the courtyard and began yelling at her when he saw her, asking where the children were and why she had taken them from him. Anderson asked him to calm down and said that she was there to bring him to the fireworks, but Hart directed profanities at her and asked why she was always trying to steal his children. Anderson replied that Hart should sit in the courtyard and drink water because he seemed unstable, and then she would take him to see the fireworks, which would not start for some time. Hart did not directly rebut this portion of Anderson's testimony.

Anderson then walked into the courtyard so that Hart would follow her. He continued yelling at her, using profanities and insulting her and asking why she steals his children from him and why she hates him and treats him badly. Anderson asked him to calm down and stop shouting; he replied that he was not shouting and then demonstrated what he believed shouting was. According to Anderson, Hart then began to hit her with an open hand on her left side, back, shoulders, and face, while telling her to take him to the children. She told him that she would not because he was hitting her, at which point Hart pulled Anderson by her hair out of the courtyard into the road and again told her to take him to the children. He then tried to drag her down the road by her hair, causing her to fall, after which she began screaming for help. Hart pulled her by her hair to pick her up before letting go, pointed down the road and asked if the children had gone that way, and took steps in that direction.

Anderson ran into the courtyard to open the door into the house, which had a large pane of glass in the center. When she put her hand on the door handle, Hart put his hands on her back and pushed her from behind into the glass, breaking it and swinging the door open. Anderson testified that her head was turned downward and to the left and that the top of her head made contact with and went through the glass pane when Hart pushed her, though she tried to brace herself by placing her right arm near her head. Anderson repeatedly characterized this action as "throwing her through the door," though it is unclear from other evidence that her entire body went through the door. In any event, Anderson testified that the swinging door rained glass inside the house, including into the children's shoes, which were in the entryway. Anderson then ran through the kitchen and sat on the couch, and Hart followed and continued hitting her, pulling her hair, and insulting her. Eventually he stopped, walked outside, and sat down at the table in the courtyard. At that point, Anderson found a broom and a dust pan to try to sweep up the glass. She then went outside, opened and activated an audio recording application on her cell phone, and placed the phone on the table near Hart, who was sitting in a stupor trying to hold his head up and roll a cigarette. Anderson then began to clean up the glass from the door.

Anderson introduced the recording that she made. Hart, who did not contest the recording's authenticity, repeatedly shouts at Anderson asking where the children are, using profanities in his questioning and to insult her, and repeatedly yells at her to "just [expletive] go away." Hart tells her that he is "so [expletive] tired of you" and that "you want to be so [expletive] entitled," while Anderson pleads with him to stop shouting and tells him repeatedly where the children are and that she came to bring him to them. Hart protests that Anderson "came to get me full of hate," and Anderson calmly responds again that she came to get him for the fireworks. Hart later mutters "stupid bitch." During pauses in the dialogue, sounds can be heard that Anderson identified as her cleaning up the broken glass. At one point, Hart can be

heard leaving the courtyard table. Anderson testified that he went to the entryway of the house where she was standing, asked her again where the children were, and slapped her before asking again. The recording includes a sound that Anderson identified as the slap in question. Anderson testified that after the time when the recording ends, Hart went to the lower level of the house to take a shower. When he returned, Hart asked her if they had had a fight and she said yes. She then went to sleep in the bedroom and Hart slept on the couch.

Anderson also introduced photographs of herself that she took in the days after the incident. Resp't's Ex. 14. One shows what she testified is a bruise on her back, though it is somewhat difficult to see what is depicted. Another shows her finger with what appears to be a cut that she testified was the result of bracing herself with her arm as she was pushed into the door. A third image shows what appear to be small cuts on Anderson's face that she testified were sustained when glass fell on her. The picture does not appear to show any facial bruising, though Anderson testified that Hart slapped her in the face between five and ten times during the altercation. It also does not depict the level of injury one would expect if she had been thrown through a glass door. A final photograph shows clumps of hair on a tile floor that Anderson testified was pulled out by Hart. Anderson did not specify whether this hair was pulled out and fell to the floor where the picture was taken, or whether she instead gathered it from where it fell elsewhere and assembled it for the photograph. Anderson also sent text messages immediately after the incident, including to Hart's mother. Resp't's Ex. 37. Shown those messages, Hart's mother testified that she received a text saying "he just beat me," but said that she thought that referred to a game or competition.[3] She admitted, however, that she asked Anderson to delete the messages because she did not want Hart to know that Anderson had told her what happened.

---

[3] The lighthearted reaction of Hart's mother to Anderson's reasonably clear assertion that Hart had beaten her seemed odd, both in her text messages and in her description in Court.

Hart testified that, to the best of his recollection, which was impacted by his drinking, there was no physical altercation that evening, though he agreed that an argument took place and that the glass door broke. According to Hart, the door is recessed into the stone wall of the house, and at the time the glass broke, he was standing to the left of the door, leaning against the wall, such that he could not reach or see the door because it was around the corner of the wall. Anderson, he testified, was standing in the courtyard and facing him from approximately six feet away. Hart admitted that he was drunk at the time and was likely screaming before the door broke in the same way that the audio recording captured, but he maintained that his memory of the door breaking is clear. In his telling, the parties were arguing in the positions he described and not moving aside from hand gestures when the door spontaneously slammed shut. According to Hart, the door was often ajar and had a warped frame such that a wind gust through the windows on the lower level of the house, which would have been open at that time of year, could cause it to slam. Hart denied that he made any physical contact with Anderson during the argument and testified that the glass of the door exploded outwards into the courtyard when the door slammed, not into the house. Hart testified that he wanted to continue the argument after the glass broke but that Anderson immediately started cleaning it up and told him not to help because he would cut himself.

The credibility of Hart's account, which is already dubious from his description, is further undercut by a text message that he sent to Anderson through Skype on July 17, 2019, which states that "I have already made arrangements to get the window that I fell into fixed." Resp't's Ex. 38. While not consistent with Anderson's claim, this is also inconsistent with his claim that a gust of wind caused the door to slam and shatter. Hart testified that this statement was an attempt to deescalate the situation by not directly refuting Anderson's account of the incident and saying that she was lying. The Court does not find this explanation credible. Though

the Court is not convinced that the entirety of Anderson's testimony was accurate, the Court finds that a physical altercation took place between the parties on the night of July 14, that Hart was intoxicated and screaming profanities at Anderson, that the glass door broke because Anderson came into contact with it through some action of Hart's rather than because of a gust of wind, and that Anderson sustained at least minor injuries.[4] Also true is that the children were not present for the altercation. Anderson testified that she did not call police after the incident because she did not want the children to see Hart being arrested if they came home at that time. When they did return, the children slept in the guest room with Irina, having insisted on staying with her.

Anderson testified that the next morning, July 15, 2019, Hart awoke on the couch and asked her what happened to the door. She told him that he pushed her through it, and he gasped and asked her to come over so that he could see her injuries. She sat down on the edge of the couch; Hart recalled her sitting there but testified that he could not see any cuts, though he was not wearing his glasses. According to Anderson, Hart then said "I guess this means no more alcohol," and she told him that he needed help and walked away. Hart then went back to sleep while Anderson made coffee and the children had cereal for breakfast. Later that day, Hart, Anderson, and the children went with Irina to visit the city of Annecy. At another point during the day, however, Anderson began making arrangements to leave France with the children without telling Hart. That evening, Anderson prepared dinner at the Usinens House, which Hart joined briefly.

The following day, July 16, Anderson left the Usinens House and flew to the United States with the children to stay with her mother in Maryland. Hart testified that he saw Anderson

---

[4] The pictures do not, however, appear to corroborate Anderson's claim that she was hit in the face five to ten times and thrown through the glass door.

briefly in the kitchen of the house that morning and assumed she was taking the children to play in a field nearby, perhaps with Irina, who was still staying at the house. After replying to emails in his office in the rear cottage, Hart returned to the front of the house to find Irina's car, Anderson, and the children gone. When Hart sent a message to Anderson asking where they went, Anderson replied that she needed space after the incident on July 14 but that she would return with the children. Later that day, however, Hart's mother contacted him and said that a United Airlines charge on a credit card that she shares with the parties had been declined, but that another set of flights on Royal Air Maroc had been successfully purchased. Hart then looked through the house and discovered that the children's tablet computers and passports were gone, and he assumed correctly that Anderson had taken the children to the Washington, D.C. area without his consent, as she had done previously. Hart eventually followed Anderson to Maryland, where he is renting an Airbnb while his Petition has been pending before the Court.

Anderson testified that if the children are returned to France, as the Petition seeks, she would not be able to join them because she is afraid that Hart's behavior toward her will escalate and she would have no place to stay. She also stated that Hart is incapable of caring for the children on his own and expressed fear that he would take out his anger on them in her absence. Notably, however, when asked why she took the children to the United States rather than seeking custody in French courts, she testified that her reason for leaving was not to seek custody of the children or to take them away from Hart because of concern for their physical safety, but rather to "get his attention" and signal that he is troubled and needs help in addressing "his demons." Anderson readily affirmed when pressed that she did not remove the children from the Usinens House out of concern that Hart would harm them, but rather to show Hart that her concerns about his well-being are serious. Anderson also admitted that she has drunk excessive amounts of alcohol in the past, that she and Hart had mutually agreed that neither would drink alcohol after

the July 14, 2019 incident, that to her knowledge, they have both honored that promise, and that it has benefitted the children.

The parties have exchanged text messages using Skype since Anderson came to Maryland with the children. Anderson characterized these conversations as primarily focused on her efforts to secure counseling and assistance for Hart. The parties each highlighted specific messages. In one message, dated July 17, 2019, the day after Anderson and the children arrived in the United States, Anderson stated to Hart that "I know that you are feeling a lot of anger hurt and heartbreak right now," and then continued "If I had told you before hand you never would have let me leave." Pet'r's Ex. 20. The parties discussed future plans on July 19, 2019. Hart stated that "Dc [sic] is a no go. Please stop trying to sell / force it." Pet'r's Ex. 21. Anderson replied "I will wait tables before going back to the Philippines." *Id.* Hart understood that message to mean that Anderson had no desire to return to the Philippines, despite her commitment to the temporary teaching position at BEIS. Anderson did not clarify what either of her statements meant in her testimony, but did testify on cross examination that at the time she accepted the BEIS position, she intended to remain indefinitely in the Philippines. Finally, Hart stated on July 30 that "It costs less to do that and it was for a purpose, a move to what was supposed to be a better life, not for a 'holiday.' Even if we had not moved to philippines [sic], we would not have had the money to burn on that trip." Resp't's Ex. 31. Hart explained that the message addressed whether the parties had funds for a trip to the United States while in the Philippines and was not suggesting that the Philippines move was intended to be permanent.

Hart filed a Hague Convention Petition seeking return of the children to France on September 9, 2019. ECF No. 1. On September 10, 2019, the Court issued a Show Cause Order prohibiting Anderson from removing the children from Maryland pending disposition of the Petition and ordering Anderson to appear before the Court on September 13, 2019 and to

surrender the children's passports. ECF No. 6. On September 13, Anderson appeared by telephone while her counsel appeared in person and provided the children's passports. ECF No. 9. A Scheduling Order was issued establishing an expedited timeline for discovery on September 25, 2019. ECF No. 15. Anderson filed an Answer and Motion to Dismiss the petition on September 27 and an amended version shortly after. ECF Nos. 16, 17, 18. The parties then conducted discovery and appeared before the Court for an evidentiary hearing on November 6 and 7, 2019, and an additional hearing for closing arguments on November 13, 2019.

## II.    DISCUSSION

Given the above findings of fact, the Court now turns to the prevailing law. In so doing, the Court identifies two questions, which are determinative of this case: (1) was France the habitual residence of the children at the time of removal; and (2) would a return to France subject them to a grave risk of harm. The Court answers each question in turn.

### A.  Wrongful Removal and Habitual Residence

A multilateral treaty to which the United States is a signatory party, "[t]he Hague Convention seeks 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access.'" *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (quoting Hague Convention, pmbl., 19 I.L.M. at 1501). Under ICARA, the federal statute implementing the Convention, a parent seeking return of a child from another country has the burden to prove, by a preponderance of the evidence, that the child was "wrongfully removed" under the terms of the Convention. 22 U.S.C. § 9003(e)(1)(A); *see Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 345 (D. Md. 2017). "Specifically, the petitioner must establish that: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal; (2) the removal was in breach of the petitioner's custody rights under the

law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal." *Maxwell*, 588 F.3d at 250 (citing *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001)).

There has been no serious dispute regarding Petitioner's claim that he was exercising his custodial rights at the time the children were removed, and that the removal breached those custody rights. Hart has met his burden on those prongs by submitting an unrebutted affidavit of a French attorney that describes relevant provisions of French law and the custody rights that they establish for Hart. As for their exercise, the Fourth Circuit has adopted a test that directs courts to "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Bader*, 484 F.3d at 671 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). Given that Hart was cohabitating continuously with Anderson and the children, his exercise of custody rights under this test cannot be disputed. Thus the Court's analysis will focus on whether the children were habitually resident in France, as Petitioner claims, at the time of removal.

"The framers of The Hague Convention intentionally left 'habitual residence' undefined, and intended that the term be defined by the unique facts in each case." *Id.* at 251 (citing *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). "Federal courts have developed a two-part framework to assist in the habitual residence analysis. Under this framework, the first question is whether the parents shared a settled intention to abandon the former country of residence." *Id.* (citing *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). "The second question under this framework is whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment.'" *Id.* (quoting *Papakosmas v. Papkosmas*, 483 F.3d 617, 622 (9th Cir. 2007)). Importantly, in a Hague Convention case, the court is not to address the merits of any "underlying custody claim—a determination which is reserved for the courts of the country of

habitual residence." *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007) (citing *Cantor v. Cohen*, 442 F.3d 196, 199 (4th Cir. 2006)).

"In cases where there is a dispute regarding a child's habitual residence, 'the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence.'" *Maxwell*, 588 F.3d at 252 (alteration in original) (quoting *Gitter v. Gitter*, 396 F.3d 124, 135 (2d Cir. 2005)). Courts must examine the "subjective intentions of parents to determine whether the parents shared an intent to adopt a new country of residence for their children." *Id.* (summarizing the reasoning of *Gitter*). "Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Id.* (footnotes omitted).

Hart maintains that the habitual residence of the children was France before Anderson removed them to the United States. ECF No. 46 at 8–12. Anderson, for her part, contends that the Petition must be denied because the children were habitual residents of either Mali or the Philippines at the time Anderson took them to the United States, or possibly had no habitual residence at that time. ECF No. 45 at 5. Significantly, Mali is not a party to the Hague Convention,[5] and the Convention is not in force between the United States and the Philippines.[6] Hart's prima facie case therefore turns on whether he has met his burden to show that France was

---

[5] *Mali*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/International-Parental-Child-Abduction-Country-Information/Mali.html (last visited Nov. 20, 2019).
[6] U.S. Dep't of State, 2019 Annual Report on International Child Abduction 100 (2019), https://travel.state.gov/content/dam/NEWIPCAAssets/pdfs/2019%20Report.pdf.

the children's habitual residence when they were taken to the United States on July 16, 2019.

As an initial matter, the Court is unpersuaded by Anderson's alternative argument that the children had no habitual residence at the time of removal. To be sure, it is quite clear that Hart and Anderson's family can be fairly described as nomadic, which puts strain on the legal frameworks that courts have developed for assessing habitual residence under the Hague Convention. But the case law that Anderson cites to claim that a child may have no habitual residence only describes children moved between countries shortly after their birth. *See Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006); *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003); *see also Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004). Anderson has pointed to no authority, nor is the Court aware of any, that contemplates extending this concept beyond very young children in that specific situation. The Court will therefore proceed to considering whether Hart has met his burden of demonstrating that France, and not Mali or the Philippines, was the children's habitual residence at the time Anderson took them to the United States.

After carefully reviewing the party's submissions and the testimony and documentary evidence presented at the hearings, the Court concludes that France was the children's habitual residence when Anderson took them to the United States on July 16, 2019. In short, the two-part habitual residence framework summarized by the Fourth Circuit in *Maxwell* produces the conclusion that the parties abandoned Mali for France in 2016 but did not abandon France for the Philippines in 2018.

That the parties abandoned Mali requires little analysis. Hart and Anderson both testified that they jointly made the decision to leave Mali in January 2016 because of security concerns and the expiration of Hart's employment contract. They considered a move to the United States but decided against it. They instead together chose to bring their children to the Usinens House in France where they could live rent-free and enroll the children at the local Ecole Primaire de

Challonges. Crucially, the parties left no belongings in Mali, selling or giving away their furniture and their car and shipping the remaining items to the Usinens House. The parties both testified that while they discussed someday returning to Mali if it became more politically stable, they had no specific plans or intentions to return there when they departed. Plainly, Hart and Anderson "shared a settled intention to abandon" Mali when they left for France in 2016. *Maxwell*, 588 F.3d at 251.

The Court thus turns to whether France became and remains the habitual residence of the children, despite the time spent in the Philippines, and answers that question in the affirmative. . First, the Court finds sufficient evidence to establish that the parties intended France to be the children's habitual residence. To be sure, the seven factors identified by *Maxwell* for determining a shared, settled intent do not overwhelmingly indicate shared intent to remain in France, ECF No. 45 at 7–8, but this is an unusual case of a highly nomadic family that has never set down roots deeply in any one place. As *Maxwell* explained, "[t]he framers of The Hague Convention intentionally left 'habitual residence' undefined, and intended that the term be defined by the unique facts in each case." *Maxwell*, 588 F.3d at 251 (citing *Whiting*, 391 F.3d at 546).

The first *Maxwell* factor, parental employment in the new country, is of limited use here because Hart's contract work could be performed remotely, although Hart testified that the contracts he entered during the period living at the Usinens House were based in Geneva, a half-hour drive away. Notably, Anderson also applied for positions in Geneva at this time. Although she concurrently applied for positions in other countries as well, she had also done so while living in Mali, which was undisputedly the children's habitual residence at that time. Next, while the parties did not purchase a home in France, there was no need to because the Usinens House was already available, and they had completely abandoned their former rental residence in Mali. Further, Hart's mother submitted a written attestation to the French government, at Anderson's

request, that Hart and Anderson were living at the Usinens House, establishing a legal relation between the owner of the house and the parties that indicates a degree of stability and permanence. The items that the parties purchased for the house and the modifications that they made strengthen this impression. The next factor, marital stability, is of limited relevance here because the parties left Mali in 2016 to escape political violence, not because of issues with their marriage.

The fourth factor concerns the parties' retention of close ties to the former country. While Anderson has family and Hart has friends in Mali, few if any ties that inform their residency with their children remained there. In the cases *Maxwell* cited in which lasting ties pointed against a finding that the children's habitual residence had changed, one parent retained bank accounts and a mailing address in the former country, or the family maintained an ongoing business in the former country. *See Ruiz*, 392 F.3d at 1255; *Papakosmas*, 483 F.3d at 624. No such lasting ties to Mali are found here. With respect to the fifth factor, storage and shipment of family possessions, it is undisputed that the family discarded, gave away, or brought all of their possessions from Mali to France, strongly indicating shared intent to relocate. The sixth factor, the citizenship status of the parents and children, also points in favor of intent to relocate. While Hart's United Kingdom citizenship allowed him to stay in France without a visa, Anderson procured a *carte de sejour* to allow her to live and work in France for a year after her three-month visa period expired and had it extended. There was no testimony or evidence concerning the children's residency status, indicating that they were able to live in France without taking additional legal steps.

The final *Maxwell* factor is "the stability of the home environment in the new country of residence." 588 F.3d at 252. *Maxwell* drew this factor from the Ninth Circuit's decision in *Papakosmas v. Papakosmas*, which found that the children there lived in a "permanent state of

flux" after they were moved from the United States to the father's home country of Greece, where they lived in three different residences in four months and attended an English-language school rather than a Greek one. 483 F.3d at 627. Here, in contrast, the children lived continuously at the Usinens House, attended the local French language school, and made friends. Anderson, for her part, joined the informal village women's social group, participated in school activities, and attended social gatherings with the children. Coupled with the fact that the Usinens House had been in Hart's family for more than thirty years and the children had familiarity with it when they arrived because of their past visits, these factors indicate sufficient stability of the home environment for the nearly two years the children lived there.[7]

Those factors also speak to the acclimatization prong of the *Maxwell* analysis, which considers "school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age." 588 F.3d at 254. Plainly, there is a sufficient basis to conclude by a preponderance of the evidence that the children were acclimatized to France after leaving Mali. The Court finds the same, sufficient degree of evidence that there was a settled, shared intent among the parties to abandon Mali and reside at the Usinens House. To be clear, while Anderson's testimony suggested that she did not feel stable in France, the Court must look beyond those representations to "determine [habitual residence] from all available evidence." *Maxwell*, 588 F.3d at 252 (alteration in original) (quoting *Gitter*, 396 F.3d at 135).

Having concluded that France was the children's habitual residence at the time the family left for the Philippines in 2018, the Court now turns to the more nuanced question of whether the move to the Philippines was an abandonment of France that again changed the children's

---

[7] Anderson's pretrial brief suggested that the Usinens House could not be the location of a stable environment because it was "unsuitable for winter habitation." ECF No. 45 at 8. The evidence presented at trial did not substantiate that assertion, however. Though the house was old and lacked central heating, that the parties took the children there in January 2016 to contemplate their safety in Mali, and lived there for two subsequent winters without apparent issue, suggests that it was sufficiently suitable.

habitual residence. Turning again to evidence of shared, settled parental intent and applying the seven *Maxwell* factors to this transition, although some factors support Anderson's position, on balance the Court finds that the Philippines move was not intended to establish a new habitual residence.

Regarding the first factor, parental employment, though Hart continued his remote consulting work, Anderson tutored children and applied for resort jobs on Boracay and other positions in nearby cities before securing the temporary teaching job at the children's school. However, it seems clear that even Anderson did not see this as a gateway to a more permanent position as indicated by her text message to her father on June 30, 2019 that she wanted to "follow thru [sic]" with the temporary job but that she could "move back to the US" after it finished in December. Pet'r's Ex. 19. Next, the factor concerning the purchase of a home in the new country does not support Anderson's position. While the parties signed a one-year lease for the Dutch Lion Apartments, the lease term ran only through the conclusion of Anderson's temporary position. Though the parties also instructed the Kalimuddins to find them a cheaper apartment when they left for France in July 2019, there was no testimony that they sought a lease longer than necessary for Anderson to complete her teaching appointment.

The third factor, marital stability, points against Anderson as well. The parties both testified that Hart proposed the move to the Philippines as a potential means to remedy tensions in the marriage and to help address Anderson's depression. While Anderson did not testify that she saw staying in the Philippines as conditioned on the marriage improving, *cf. Ruiz*, 392 F.3d at 1254–55, the multiple physical incidents between the parties indicate that marital stability was decreasing rather than improving in the Philippines. Tellingly, Anderson's message to her father that she could move to the United States after December was sent on June 30, 2019, the day after Hart allegedly kicked in the door of the apartment. *Id.* This sequence of events suggests that the

lack of intent to remain in the Philippines that Anderson expressed to her father was at least partially a result of her discontent with the marriage.

The next two factors, retention of ties to France and the storage and shipment of family possessions, are linked and strongly support that the children's habitual residence remained France. Most crucial is Hart's unrebutted testimony that very few of the children's belongings were brought to the Philippines; toys, books, backpacks, art supplies, and the children's unique nightlight were all left in France. While the evidence in this case paints a picture of two remarkably adaptable and resilient young children, that their parents allowed them to bring only one toy, basic clothing, and their tablet computers strongly suggests that their time in the Philippines was not intended to be indefinite. That Hart similarly brought very few belongings with him, testimony that Anderson did not rebut with evidence that either she or Hart brought more, strengthens this conclusion.

The parties retained further significant ties to France as well; other belongings that they had brought from Mali remained in storage in France when they left for the Philippines, and they had both discussed plans for future renovations for the house using the gifted funds from Ms. Patai. Also important is that the parties chose BEIS as the children's school in the Philippines specifically because French schools would grant the children credit for their school year there, which indicates parental intent to enroll the children in French schools in the future. Even more revealing are Anderson's statements on Facebook at the time of the move, made to friends in France, that the parties "plan to return to Usinens in 10 months" and "are her [sic] for a year or so." Pet'r's Ex. 9. Anderson's explanation that she was referring to a short summer vacation in France is undermined by the wording used, particularly in the statement that the family would be in the Philippines "for a year or so." *Id.*

Moving to the citizenship status of the parents and children, that the parties obtained and

renewed tourist visas further indicates the temporary nature of their stay, although the local government ID card that Anderson obtained was a somewhat more permanent step. *See* Resp't's Ex. 4. Additionally, Anderson purchased round-trip tickets when the family left France. That she apparently did so in order to be eligible for short-term tourist visas weakens, rather than strengthens, the argument that the move was intended to be indefinite. Finally, the nature of the children's home environment in the Philippines is somewhat reminiscent of the experience of the children in *Papakosmas*. 483 F.3d at 626–27. As in that case, the children here lived in multiple apartments in less than six months and attended an international school. To be sure, the Dutch Lion accommodations were somewhat more stable than the bamboo hut and the beach apartment, though the children only lived there from January 2019 to early July 2019.

Overall, the factors refute the claim that there was a shared, settled intent of the parties to abandon France and relocate to the Philippines. Among many relevant factual considerations, most telling are that the parties left most of their belongings at the Usinens House and that Anderson indicated in text messages and Facebook comments that she did not intend to stay indefinitely, both at the time the family left France and just before they returned. Anderson's statement to Hart just after coming to the United States that she would "wait tables before going back to the Philippines" reinforces the meaning of her prior messages. Pet'r's Ex. 21.[8] It does not alter this analysis that the parties both planned to return to the Philippines from August to December, left some items and their cats at the Dutch Lion apartments, and re-enrolled the children at BEIS. An intent to return to the Philippines for that period for Anderson to complete her three-month teaching position is not inconsistent with an intent to leave the Philippines soon afterwards. Notably, on the form to enroll the children at BEIS for the 2019-2020 school year,

---

[8] And, to the extent Respondent now contends the Philippines is the children's habitual residence, it is worth noting that she did not relocate there upon leaving France but instead came to the United States.

Anderson selected the option to pay tuition by trimester, which presumably would facilitate removing the children from the school partway through the school year. Nor does the July 30, 2019 text message from Hart stating that going to Boracay was "a move to what was supposed to be a better life, not for a 'holiday,'" substantially indicate intent on his part to remain indefinitely, especially when weighed against the countervailing evidence. Resp't's Ex. 31. At most, the message shows what Hart acknowledged: that the parties contemplated remaining in the Philippines beyond their initial planned stay and the extension for Anderson's position at BEIS, but never formulated a concrete, settled, and shared intent to do so that was sufficient to dislodge France as the children's habitual residence.

Only a brief discussion of the acclimatization prong of the *Maxwell* analysis is necessary. The question for the acclimatization inquiry is "whether the 'child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed.'" *Maxwell*, 588 F.3d at 253–54 (alteration in original) (quoting *Mozes*, 239 F.3d at 1081). That inquiry is irrelevant with respect to the Philippines because the children are no longer there, but rather have been relocated to Maryland by Anderson. While there is a moderate amount of evidence that the children were acclimatized to the Philippines, including their successful school year at BEIS, engagement in social activities in and out of school, and relatively long eleven-month stay there, those considerations would have bearing only if the children were still in the Philippines and Hart was seeking their return to France. Because the children are now in a third country and they will not return to the Philippines, their acclimatization there is irrelevant.[9] Therefore, because there was no shared, settled intent of the

---

[9] Indeed, it would appear Respondent proposes the Philippines (or Mali) as a habitual residence solely to avoid application of the Convention.

parties to abandon the children's habitual residence of France in favor of the Philippines, the Court concludes that Hart has established his prima facie case of wrongful removal.

## B. Grave Risk of Harm Exception

Once a petitioner has established a prima facie case that a wrongful removal occurred, "the respondent must return the child unless the respondent can show that an exception applies under the Hague Convention." *Luis Ischiu*, 274 F. Supp. 3d at 345 (citing *Miller*, 240 F.3d at 398). Article 13(b) of the Hague Convention establishes an exception that Anderson asserts here. Under that exception, "the Court 'is not bound to order the return of the child' if the respondent can establish by clear and convincing evidence that 'there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" *Id.* at 350 (quoting Hague Convention art. 13(b)). "[T]his defense," however, "is a narrow one," *Miller*, 240 F.3d at 402, and is interpreted and applied in that manner "[t]o avoid circumventing the underlying purpose of the Hague Convention." *Luis Ischiu*, 274 F. Supp. 3d at 350 (citing *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007)).

Importantly, "[a]lthough there is no clear definition of what constitutes 'grave risk,' the respondent 'must show that the risk to the child is grave, not merely serious.'" *Id.* (quoting *Friedrich*, 78 F.3d at 1068). "The potential harm to the child must be severe, and the '[t]he level of risk and danger required to trigger this exception has consistently been held to be very high.'" *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (alteration in original) (quoting *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000)). "The risk must be more than the trauma associated with uprooting and moving the child back to the country of habitual residence." *Luis Ischiu*, 274 F. Supp. 3d at 350 (citing *Friedrich*, 78 F.3d at 1068). The exception "typically applies to situations involving sexual abuse, significant physical and verbal abuse of the child, or domestic abuse of a spouse in the presence of the child." *Kovacic v. Harris*, 328 F.

Supp. 3d 508, 520 (D. Md. 2018) (citing *Luis Ischiu*, 274 F. Supp. 3d at 350)). "It does not apply to allegations of 'poor parenting'; it is not the court's role to 'determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the environment offered by Petitioner.'" *Id.* (quoting *Hirst v. Tiberghien*, 974 F. Supp. 2d 578, 596 (D.S.C. 2013)); *see also Alcala v. Hernandez*, 826 F.3d 161, 171 (4th Cir. 2016) (stressing that the role of courts adjudicating Hague Convention petitions is not to use a "best interests of the child" standard because wrongful removal cases are not custody disputes); 22 U.S.C. § 9001(b)(4) ("The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.").

Anderson asserts that returning the children to France would expose them to a grave risk of harm because Hart abuses her in their presence. ECF No. 45 at 11. While the Court in no way condones Petitioner's behavior and treatment of Respondent, in light of the narrowness of the grave risk of harm exception, the clear and convincing evidentiary burden that Anderson must meet, and the relative lack of evidence that she has put forth demonstrating abuse of the children or abuse of her in front of the children, the Court finds that the exception does not apply in this case.

To begin, there is no evidence in this case, and Anderson does not allege, that Hart has ever subjected either of the children to abuse or violence of any kind. That distinguishes this case from many others in which a grave risk of harm was found. *See, e.g.*, *Simcox*, 511 F.3d at 598–99 (finding that a grave risk existed where the father was "both verbally and physically violent with his wife and children" and engaged in "frequent episodes of belt-whipping, spanking, [and] hitting" the children, "yelling and screaming" at them, and pulling their hair and ears); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (finding sufficient evidence of grave risk to deny summary judgment where the father beat his wife severely and repeatedly in the

presence of the children, spanked and repeatedly hit one of the children, and threatened to kill the children). Some cases have found that a grave risk existed because of a father's abuse of a mother in front of their children, even where the father never directed abuse at the children themselves. *See, e.g.*, *Baran v. Beaty*, 526 F.3d 1340, 1345–46 (11th Cir. 2008) (finding grave risk where the father abused alcohol daily and often drove drunk, was physically and verbally abusive toward the mother in the child's presence, including by throwing furniture and other objects at her, and recklessly and negligently endangered the child when it lived with him); *Walsh v. Walsh*, 221 F.3d 204, 210–11, 219–20 (1st Cir. 2000) (finding a grave risk where the father physically abused the mother for several years, often in front of the children, and had a history of fighting others and violating court orders).

Here, it is undisputed that, at most, the children were only present for one of the physical altercations between Hart and Anderson – the January 2019 incident in the Philippines when Hart "dragged" Anderson out of bed – and it was uncontested that they were not awake until after the physical contact had ended. That renders this case much more comparable to those in which a grave risk of harm was not found, despite evidence of a father's physical abuse of his children's mother. For example, in *Souratgar v. Lee*, the Second Circuit affirmed a district court's finding that no grave risk of harm existed where the father repeatedly kicked, slapped, grabbed, and hit the mother, and engaged in shouting and offensive name-calling, but never in the child's presence. 720 F.3d at 100, 104–05. Similarly, the Tenth Circuit in *Gil-Leyva v. Leslie* affirmed a finding that no grave risk existed where the father slapped and shoved the mother several times, once choked her with his hands, and threw things, but was never physical toward the children aside from a small number of spankings, and never abused the mother in front of the children except for occasionally slapping her with force on her buttocks. 780 F. App'x 580, 590–91 (10th Cir. 2019). The court found that evidence was deeply concerning and would be relevant

in custody proceedings in the courts of the children's country of habitual residence but was insufficient to prove that a grave risk of harm would exist if the children were returned there. *Id.* at 590.

Likewise, here, Respondent has not established by clear and convincing evidence that granting the Petition would expose the children to a grave risk of physical or psychological harm. The Court acknowledges and does not take lightly Anderson's stated fear that Hart may begin to engage in violence against the children if they are returned to France and Anderson is not present in the household. But Anderson's trepidation, even if justified, does not amount to clear and convincing evidence of a grave risk with no prior history of abuse towards the children. *See Souratgar*, 720 F.3d at 106 (finding no grave risk of harm to the parties' child, despite the respondent's claim that the petitioner was "likely to turn on" the child, because there was no history of child abuse and evidence instead indicated a "loving father-son relationship"). Nor does Anderson's testimony that Hart is a neglectful father who does not and cannot adequately care for the children. That evidence speaks to which parent is better suited to protect the interests of the children, which is an inquiry properly reserved for custody courts. *Alcala*, 826 F.3d at 171.

Indeed, it is Respondent's own words in a colloquy with the Court that most clearly make the point that the grave risk exception would not be appropriate to apply here:

> Court: You had said earlier, and I'm mentioning and returning to this, that you did this to get his attention?
>
> Anderson: Yes.
>
> Court: I just want to flesh that out just a little bit. So were you not trying to get the kids away from him when you did this? Was that not part of what you were doing?
>
> Anderson: That is correct.
>
> Court: That's correct that that's not what you were – that wasn't the goal?
>
> Anderson: That was not the goal.

Court: It was just to get his attention?

Anderson: Yes.

Court: Okay. Explain what you mean when you say you're doing this to get his attention.

Anderson: I have spent many years trying to speak to him, talk to him, help him, suggest therapy, AA, whatever is needed to work through his demons. I know that he is deeply troubled, he has expressed, you know, thoughts of self-harm, and he harbors a lot of anger, to who exactly I'm not sure, but every single time I do that he dismisses me, he says it's all in my head, if I want to go to therapy I should go by myself, clearly I have a problem with him, and that I'm responsible for my own misery.

Court: And so your idea is, by taking this act, it forces him to look in the mirror? Is that –

Anderson: Well, so being alone in the house, realizing how much I did for him, the cleaning, the cooking, the organizing, the laundry, going grocery shopping, all that stuff being by himself for a little bit he would see how much I actually brought to the table, and so my concerns were valid.

Court: So then is your concern, or was your concern more about your relationship with him and him appreciating you as a wife than it was about, at that point, in removing them for the benefit of the kids or for the welfare of the kids?

Anderson: This was never about the children.

Court: So you didn't remove them from the situation because of your concern that he would harm the children?

Anderson: Correct.

Based on the Court's observations, Respondent's concerns for her husband's use or abuse of alcohol and the anger it appears to cause in him are well-founded. But, given the purposes of the Hague Convention, moving his children to another country was not an appropriate way to "get his attention," which she acknowledges was her primary objective. Her words also undercut the notion that she genuinely perceives that the children would be subject to a grave risk of harm if returned to France.

In sum, evidence of Petitioner's treatment of Respondent is certainly troubling and it is tempting for the Court to assume the role of a family judge and make custody determinations

with the best interests of the children in mind. But that is not the Court's role here. Instead, applying the principles of the Hague Convention, the Court concludes that Respondent wrongfully removed the children from their habitual residence, that she breached Petitioner's custodial rights, and that Petitioner was exercising those rights at the time of removal. Additionally, the grave risk of harm exception does not apply. It is left for the appropriate authority in the appropriate jurisdiction to make any further determinations.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant the Petition, ECF No. 1. A separate Order shall issue.

Dated: 11/22/2019                                          /s/_____
                                                          GEORGE J. HAZEL
                                                          United States District Judge