IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| MARKKU TORYALAI HART, | * |
| Petitioner, | * |
| v. | Case No.: GJH-19-2601 |
| | * |
| SALLY BELCO ANDERSON, | * |
| Respondent. | * |

**MEMORANDUM OPINION**

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, 1980 WL 115586 (the "Hague Convention" or "Convention"). Pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011, which implements the Hague Convention in the United States, Petitioner Markku Toryalai Hart filed a Petition before this Court on September 9, 2019, to seek return of his children to France after his wife, Respondent Sally Belco Anderson, brought them to the United States without Hart's consent. ECF No. 1. The Court granted Hart's Petition on November 22, 2019. ECF No. 55; ECF No. 56; ECF No. 59. Now pending before the Court is Petitioner's Motion for Attorney's Fees and Costs. ECF No. 62. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Petitioner's Motion is denied.

**I. BACKGROUND**

**A. Factual Background[1]**

Petitioner Hart, a United States and United Kingdom citizen, and Respondent Anderson,

---
[1] These facts are taken from the Court's findings of fact as outlined in its previous Memorandum Opinion. ECF No. 55 at 1–27. The Court's findings are based on evidence presented at evidentiary hearings held on November 6 and 7,

1

a United States citizen, first met in Mali in 2010. ECF No. 55 at 2.[2] Hart is a self-employed consultant specializing in cold chain equipment and logistics, which is technology used in the transportation of vaccines. *Id.* At the time, Anderson taught preschool children at an international school. *Id.*

Hart and Anderson married in March 2012, one month before the birth of their first child. *Id* at 4. Due to subpar prenatal care in Mali, the parties decided Anderson would have the child in Indiana, where Hart's mother resides. *Id.* A military coup in Mali prevented the family from returning home immediately after the childbirth, but the family did return to Mali six months later when the domestic situation stabilized. *Id.* Anderson became pregnant with the couple's second child in late 2013. *Id.* After giving birth in Virginia—where her parents lived—Anderson returned to Mali with the children. *Id.*

Around this time, a physical altercation occurred between the parties. *Id.* After witnessing Anderson spank their older child, Hart confronted Anderson to express his disapproval of corporal punishment. *Id.* Anderson then pushed Hart, and Hart pushed back in response, causing Anderson to fall. *Id.* at 4–5.

In January 2016, the family evacuated to France after a terrorist attack in Mali. *Id.* at 5. The parties and their children began living in a home owned by Hart's mother in Usinens, France ("the Usinens House"), which the family had previously visited on multiple occasions. *Id.* at 3–5. By the summer of 2016, both parties agreed that the family would remain in France indefinitely. *Id.* at 5. The parties sold or gave away many of their belongings in Mali, informed friends they

---

2019, which included the testimony of the parties, their respective mothers, and a family friend, as well as documentary materials. *Id.* at 2.

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

were leaving, and transported the rest of their belongings to France. *Id.* at 5–6.

In May 2018, Hart visited the Philippines for a work project. *Id.* at 9. Hart had not previously been to the Philippines, and he enjoyed the country. *Id.* When Hart returned to France, he proposed taking the family to the Philippines for an extended period. *Id.* Anderson agreed to the trip on the condition that it would last no longer than one year—which both parties understood. *Id.* at 10. The parties packed some, but not all, of their belongings and departed for the Philippines in August 2018. *Id.* at 11.

During the family's time in the Philippines, two incidents involving alcohol occurred. *Id.* at 13. In January 2019, Hart and Anderson went to a party at the home of a friend. *Id.* Anderson left early to take the children home to bed while Hart stayed at the party, returning home a few hours later. *Id.* While Anderson was lying in bed with the children, Hart entered the children's bedroom and asked Anderson to sleep with him. *Id.* Anderson rebuffed Hart and told him that he was drunk and should go to sleep. *Id.* Hart briefly left the room and returned with an iPad loudly playing pornography. *Id.* Hart was also naked and masturbating. *Id.* Anderson screamed and told Hart to leave the room. *Id.* Hart then pulled Anderson out of the bed and the room—telling her he forgot she "like[d] it rough"—and threw her against a wall. *Id.* at 13–14. After Anderson screamed and tried to push Hart away, he slapped her in the face and threw a coffee kettle and beer bottle at her, which woke the children. *Id.* at 14.

In June 2019, Hart and Anderson attended a beachside gathering at a restaurant with friends to say their goodbyes before returning to France. *Id.* at 16. When the children became tired, a friend offered to take them back to the friend's nearby condominium to watch television with their own children. *Id.* Anderson approved and stayed at the restaurant with Hart. *Id.* Later in the evening, Hart expressed interest in going to a bar with a friend. *Id.* Anderson and Hart

agreed to meet at the friend's condominium—where the children were watching television—in one hour. *Id.* Hart gave Anderson his bag—which included his house keys—and left for the bar. *Id.*

Hart never met Anderson at the condominium. *Id.* He instead returned home after leaving the bar, but unable to open the door without his keys, he broke down the door with force. *Id.* Anderson fell asleep with the children on the couch in the condominium and returned home around 6:30 a.m. to find a broken door. *Id.* The next day, Anderson texted her father that she believed Hart needed treatment because he had become unreliable, unpredictable, and abusive. *Id.* at 17.

In July 2019, the family returned to France. *Id.* at 18. Shortly thereafter, another physical altercation occurred. *Id.* at 19–24. On July 14, 2019, Hart—who was intoxicated—screamed profanities at Anderson and instigated physical contact that resulted in Anderson falling through a glass door. *Id.* at 24. Anderson sustained minor injuries, and the children were not present during this incident. *Id.* at 24.

Anderson took the children to the United States two days later, on July 16, 2019, without notifying Hart. *Id.* at 24–25. Anderson testified that she took the children away from Hart to "get his attention," not out of concern for their safety. *Id.* at 25.

### B. Procedural Background

On September 9, 2019, Hart filed a petition to seek return of his children to France under the Hague Convention, which is implemented in the United States pursuant to the ICARA, 22 U.S.C. §§ 9001–9011. ECF No. 1. After a two-day evidentiary hearing and a third hearing for legal argument, the Court found, on November 22, 2019, that the children's habitual residence was France—a party to the Hague Convention—and that Anderson wrongfully removed the

4

children to the United States under French law. ECF No. 55 at 28, 30. The Court therefore granted Hart's Petition to return the children to France. *Id.* at 43; ECF No. 56; ECF No. 59.

Eleven months later, on October 29, 2020, Petitioner Hart filed a Motion for Attorney's Fees and Costs pursuant to 22 U.S.C. § 9007 and Fed. R. Civ. P. 54. ECF No. 62. Respondent Anderson responded in opposition to Hart's Motion on November 6, 2020, claiming that an award of fees and costs is clearly inappropriate. ECF No. 63.

## II. DISCUSSION

The ICARA provides that "[a]ny court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, *unless the respondent establishes that such order would be clearly inappropriate.*" 22 U.S.C. § 9007(b)(3) (emphasis added). However, the ICARA does not define "clearly inappropriate." *Rath v. Marcoski*, 898 F.3d 1306, 1311 (11th Cir. 2018); *Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013) (noting the absence of "any statutory guidance").

The Fourth Circuit recently provided guidance for determining whether a fee award is clearly inappropriate within the meaning of the ICARA. In *Sundberg v. Bailey*, the Fourth Circuit found that district courts have "limited discretion" to determine that "the circumstances of a case overcome the rebuttable presumption in favor of a fee award[.]" 765 F. App'x 910, 914 (4th Cir. 2019) (citing *Rath*, 898 F.3d at 1311). In making this finding, the Court relied on the reasoning of the Eleventh Circuit in *Rath v. Marcoski*, which held that "Congress . . . grant[ed] courts limited equitable discretion to determine when to allow an exception" and that the inquiry is "fact-dependent." *Rath*, 898 F.3d at 1311. The Fourth Circuit, in *Sundberg*, also approved of two examples—which had previously been outlined by the Eleventh Circuit in *Rath*—where a

5

fee award would be "clearly inappropriate[:]" (1) where "the respondent acted in good faith" or (2) when "the award would impair the respondent's ability to care for the child." *Sundberg*, 765 F. App'x at 914 (citing *Rath*, 898 F.3d at 1311).[3] The Court discusses each of these examples and their application to the instant case below, as well as a third equitable exception to the award of fees under 22 U.S.C. § 9007(b)(3), unclean hands.

      A.      **Good Faith Exception**

As to the first *Sundberg* example, a respondent acts in good faith only when she "belie[ves] that her actions in removing or retaining a child were legal[.]" *Rath*, 898 F.3d at 1311; *Mendoza v. Silva*, 987 F. Supp. 2d 910, 915 (N.D. Iowa 2014) ("[W]here the respondent had a 'reasonable basis for thinking at the time of removing the children to the United States . . . that her actions were consistent with [the law of the country of habitual residence],' that belief, even if mistaken, 'is a relevant equitable factor when considering whether a costs award is appropriate.'" (quoting *Ozaltin*, 708 F.3d at 375)). This exception to ICARA's fee presumption, however, does not apply when the respondent simply believes removal is in the best interest of the child. *Neves v. Neves*, 637 F. Supp. 2d 322, 345 (W.D.N.C. 2009) (holding that the respondent's honest belief that removal was necessary to protect children from racial prejudice was not sufficient to establish good faith). The good faith belief standard in this context therefore refers to honest "mistake[s] of law . . . [which is] a relevant equitable factor when considering whether a costs award is appropriate." *Ozaltin*, 708 F.3d at 375.

For example, in *Rath*, the Eleventh Circuit found the respondent did not have a good faith belief that removing her child was legal because the respondent initiated custody litigation

---

[3] The Fourth Circuit did not indicate, however, that these two examples are the only sets of circumstances that would render a fee award clearly inappropriate, and thus the Court maintains equitable discretion to craft additional fact-dependent exceptions.

immediately upon arriving in the United States. 898 F.3d at 1312. Filing custody orders can "indicat[e] [the respondent's] awareness that she was in violation of the existing custody agreement." *Malmgren v. Malmgren*, No. 5:18-CV-287-BO, 2019 WL 5092447, at *2 (E.D.N.C. Apr. 1, 2019) (discussing the Eleventh Circuit's holding in *Rath*). The Second Circuit, in contrast, found the respondent acted in good faith when "Turkish courts repeatedly implied prior to the [m]other's removal of the children from Turkey . . . that the children could live with the [m]other in the United States." *Ozaltin*, 708 F.3d at 376. Moreover, other courts have found good faith when the respondent removed the child under the mistaken belief that the other parent consented to the removal. *See, e.g.*, *Mendoza v. Silva*, 987 F. Supp. 2d 910, 916–17 (N.D. Iowa 2014) ("Mr. Medina had a mistaken, but nevertheless good faith belief that the parties had agreed that he would take the children to the United States where they would attend school.").

Here, Respondent Anderson did not have a good faith belief that removing the children was lawful. In its prior memorandum opinion, the Court found Respondent never "serious[ly] dispute[d] . . . Petitioner's claim that he was exercising his custodial rights at the time the children were removed, and that the removal breached those custody rights." ECF No. 55 at 28.

Rather than disputing Petitioner's custody rights, Respondent argues that "[l]egally, she believed the family was now residents of the Philippines." ECF No. 63 at 2. If the children were "habitually resident" in the Philippines, as opposed to France, the Hague Convention would not have provided a remedy to the unlawful removal of the children because the Convention is not in force between the United States and the Philippines. *See* ECF No. 55 at 29 (citing U.S. Dep't of State, 2019 Annual Report on International Child Abduction 100 (2019), https://travel.state.gov/content/dam/NEWIPCAAssets/pdfs/2019%20Report.pdf). But the relevant question is whether Respondent believed the act of removing the children was legal

7

under the laws of the home country, not whether she believed the Hague Convention provided an international remedy. *Chambers v. Russell*, No. 1:20-cv-498, 2021 WL 1581074, at *1 (M.D.N.C. Apr. 22, 2021). ("The second [] factor is if the respondent had a 'reasonable good faith basis for thinking that retaining the children was in accordance with the law of the children's habitual residence.'" (quoting *Smedley v. Smedley*, No. 7:14-CV-66-F, 2015 WL 5139286, at *2 (E.D.N.C. Sept. 1, 2015))).

The only evidence in the record that Respondent's removal of the children was lawful under the custody laws of the Philippines is a citation by Respondent to the Philippine's Family Code stating, "parental authority shall be exercised by the parent designated by the Court" and "[n]o child under seven years of age shall be separated from the mother, unless the court finds compelling reasons to order otherwise." ECF No. 17 at 3 (quoting Article 213 of the Family Code of the Philippines). Even if the children were habitually resident in the Philippines, the country's law makes clear that a court must issue a custody order before the mother can be granted sole custody. Although the statute Respondent cited indicates a preference for mothers being awarded sole custody over young children, the statute still requires a court order. *Id.* The statute also provides a caveat to the general preference for the mother retaining custody, authorizing courts to deny the mother custody when there are "compelling reasons to order otherwise." *Id.* At the time Respondent removed her children to the United States, no custody order had been issued by any country. Therefore, Respondent could not have believed in good faith that she had sole custody of the children.

Respondent further argues that she removed the children in a good faith effort "to seek safety of Respondent and the children." ECF No. 63 at 1. But the good faith exception applies only when the respondent had a "good faith belief that her actions in removing . . . a child were

legal." *Rath*, 898 F.3d at 1311.

   B.   **Financial Hardship Exception**

As to the second *Sundberg* example, to defeat a fee award, the amount of the award must be large enough to impose a "financial hardship" that "significantly" impairs the respondent's ability to care for the child. *Rath*, 898 F.3d at 1311. Courts have found the "ability to care for the child" to include the capacity to provide financial support, *Djeric v. Djeric*, No. 2:18-cv-1780, 2019 WL 2374070, at *2 (S.D. Ohio June 5, 2019), visit the child, *Cocom v. Timofeev*, No. 2:18-cv-002247-DCN, 2019 WL 5964634, at *3 (D.S.C. Nov. 13, 2019), and conduct custody proceedings, *Norinder v. Fuentes*, 657 F.3d 526, 536 (7th Cir. 2011).

Other district courts have found a fee award to be large enough to significantly interfere with caring for the child when the amount is 1.5 times the respondent's annual income, *Cocom*, 2019 WL 5964634, at *3, or when the respondent has substantial debt, *Malmgren*, 2019 WL 5092447, at *2. In contrast, an award of sixty percent of the respondent's annual income does not impose a sufficiently large financial hardship—at least where the respondent also has significant assets. *Chambers*, 2021 WL 1581074, at *2. The respondent's projected future income, if foreseeable, is also a relevant consideration. *See Norinder*, 657 F.3d at 536.

A fee award in this case would significantly impair Respondent's ability to care for the children. The requested fees total over $98,000. ECF No. 62 at 1–2. Respondent earned under $7,000 in 2019 and currently earns $500 per week. ECF No. 63 at 2–3; ECF No. 63-2. A fee award in this case would be nearly four times Respondent's annual pre-tax income, which would severely impair her ability to care for the children. *Compare Cocom*, 2019 WL 5964634, at *3 (denying a fee award when the amount was 1.5 times the respondent's annual income), *with Chambers*, 2021 WL 1581074, at *2 (granting a fee award when the amount was sixty percent of

the respondent's annual income).

On her strained income, Respondent is already struggling to fund trips to visit her children. ECF No. 63 at 2. The parties are presently engaged in child custody and divorce litigation in France—where Respondent is "put[ing] what little money she has into attempting to get access to the children." ECF No. 63 at 3. Without the financial ability to visit France, Respondent cannot meaningfully care for her children. *See Cocom,* 2019 WL 5964634, at *3 ("[W]ere he required to pay the sum that Cocom requests . . . his ability to both support and visit the Child would be severely handicapped."); *Malmgren*, 2019 WL 5092447, at *2 (concluding that granting the petitioner's motion for attorneys' fees would be clearly inappropriate where the petitioner had sole custody of the minor child in Sweden and respondent, who had limited financial resources, was required to relocate to Sweden in order to petition the Swedish courts to grant her access to her child). And without the money to fund custody litigation, Respondent could legally lose the ability to care for her children. *Norinder*, 657 F.3d at 536 (indicating that whether a "fee award is so large that it will make it impossible for [the respondent] to conduct divorce and custody proceedings in [another country]" is a relevant consideration, although inapplicable in that case due to the respondent's sizable expected future income). Under these circumstances, it is clearly inappropriate to order a fee award in the instant case.

### C. The Unclean Hands Exception

The Second Circuit has applied a third equitable exception—the doctrine of unclean hands—when intimate partner violence influences the decision to remove the child. *Souratgar v. Lee Jen Fair*, 818 F.3d 72, 79 (2d Cir. 2016). In *Souratgar*, the Second Circuit held that a fee award would be clearly inappropriate because the prevailing petitioner "engaged in multiple . . . acts of intimate partner violence against [the respondent] and that [the respondent's] removal of

the child . . . was related to that violence." *Id.* This Court finds the reasoning of the Second Circuit persuasive. Where the petitioner "bears responsibility for the circumstances giving rise to the fees . . . . [t]he American legal system rightfully 'closes the doors of a court of equity to one tainted with inequitableness[.]'" *Id.* (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)); *see also Aly v. Aden*, No. 12-1290, 2013 WL 593420, at *20 (D. Minn. Feb. 14, 2013) (finding any award of expenses to prevailing petitioner clearly inappropriate in part because the petitioner "was physically and verbally abusive toward respondent"); *Guaragno v. Guaragno*, No. 09-cv-187, 2010 WL 5564628, at *2 (N.D. Tex. Oct. 19, 2010) ("Acts of family violence perpetrated by a parent is an appropriate consideration in assessing fees in a Hague case[.]"); *Silverman v. Silverman*, No. JRT-00-2274, 2004 WL 2066778, at *3 (D. Minn. Aug. 26, 2004) ("[That the petitioner] had been physically and mentally abusive toward respondent . . . is appropriately considered in determining fees.").

This Court, exercising its equitable discretion, finds the doctrine of unclean hands makes a fee award in the instant case clearly inappropriate. Petitioner's repeated pattern of physical and verbal abuse, alcohol abuse, and unpredictable behavior significantly contributed to Respondent's decision to remove herself and the children. *See Souratgar*, 818 F.3d at 79 (finding a fee award clearly inappropriate where the petitioner engaged in multiple acts of violence against the respondent and the removal of the child was related to that violence). Most significantly, in the first seven months of 2019, leading to Respondent's removal of the children in July 2019, there were three incidents of unpredictable and abusive behavior by Petitioner while he was under the influence of alcohol. First, in January 2019, Petitioner, while drunk, pulled Respondent out of bed, "threw" her against a wall, slapped her, and threw multiple objects at her. *Id.* at 14. Then, in June 2019, the Petitioner, while under the influence of alcohol, broke

into the family's apartment, destroying the door of the apartment they were renting. *Id.* at 16–17. In the final incident, occurring on July 14, 2019, only two days before Respondent took the children to the United States, Petitioner's physical aggression resulted in the respondent falling through a glass door and sustaining injury. *Id.* at 21–24. These three incidents demonstrate a pattern of alcohol abuse as well as "unreliable, unpredictable and abusive" behavior by Petitioner.[4] *Id.* at 17.

While Respondent may have admitted she did not fear for the children's safety, she did claim that she left France due to her own "misery" and "concerns" about Petitioner's "deeply trouble[ing]" behavior. *Id.* at 42. The timing of Respondent's removal of herself and the children also suggests Petitioner is at least partly blameworthy—Respondent left for the United States immediately after the petitioner's physical contact caused her to fall through a glass door. *Id.* at 24–25. Because Petitioner "bears responsibility for the circumstances giving rise to the . . . costs associated with a petition" due to his repeated pattern of alcohol abuse and violence, granting Petitioner's request for expenses would be clearly inappropriate in the instant case. *Souratgar*, 818 F.3d at 79; *see also Aly*, 2013 WL 593420, at * (finding any award of expenses to prevailing petitioner clearly inappropriate in part because the petitioner "was physically and verbally abusive toward respondent").

***

Because granting Petitioner's request would create extreme financial hardship and thus impair Respondent's ability to visit, care for, and obtain custody of her children and because Petitioner's pattern of alcohol abuse and violent behavior precipitated Respondent's removal, the

---

[4] This pattern is further evidenced by a fourth incident that occurred in 2014, where Hart pushed Anderson forcefully causing Anderson to fall. ECF No. 4–5.

12

Court finds that awarding any attorneys' fees would be clearly inappropriate in the instant case. *See Cocom*, 2019 WL 5964634, at *3–4 (finding an award of fees and costs clearly inappropriate given the respondents' dire financial situations and the impact of the award on their ability to support the child,); *Souratgar*, 818 F.3d at 82 (finding that, because of multiple acts of violence on the part of the petitioner, the court could not "envision any scenario where an award of expenses would not be clearly inappropriate"). Thus, the Court denies Petitioner's Motion.[5]

## III. CONCLUSION

For the foregoing reasons, Petitioner's Motion for Attorney's Fees and Costs is denied. A separate Order shall issue.

Date: July    6, 2021                                  /s/_____
                                                                                        GEORGE J. HAZEL
                                                                                        United States District Judge

---

[5] The Court's conclusion is further supported by the fact that Petitioner filed his Motion for Attorney's Fees and Costs over eleven months after this Court issued its Memorandum Opinion and Order granting the Petition, long after the deadline specified by the Local Rules of this Court, Loc. R. 109.2 (specifying that a motion requesting the award of attorney's fees must be filed within fourteen days of the entry of judgment and the supporting memorandum must be filed within thirty-five days from the date the motion is filed), and by the Federal Rules of Civil Procedure, Fed. R. Civ. P. 54(d)(2)(B) ("Unless a statue or a court order provides otherwise, the motion must: (i) be filed no later than 14 days after the entry of judgment[.]"). "When a party fails to timely move for fees and costs, courts generally disallow the award." *Silverman v. Silverman*, No. JRT-00-2274, 2004 WL 2066778, at *3 (D. Minn. Aug. 26, 2004) (citing *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 758 (5th Cir. 1989)) (finding that the petitioner's request for fees under the ICARA was "just barely timely"); *see also Pesin v. Rodriguez*, 244 F.3d 1250, 1253 (11th Cir. 2001) (holding that a successful petitioner under the ICARA was not entitled to an award of attorneys' fees where he failed to comply with the local rule requiring that a motion for attorneys' fees be filed within 30 days of entry of final judgment).